**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN**

**MICHEAL WAYNE LONG**                                                                                   **PLAINTIFF**

**v.**                                                                         **CIVIL ACTION NO. 1:06CV-P176-M**

**UNITED STATES OF AMERICA**                                                                         **DEFENDANT**

**MEMORANDUM OPINION**

This matter is before the Court on the United States' motion to dismiss (DN 12), and on Plaintiff's motions for class certification (DNs 6 & 19), appointment of counsel for the class (DN 6), order to show cause (DN 9), modification of relief (DN 16), leave to proceed without payment of fees (DN 20), leave for parties' agreement or court settlement (DN 21), and jury trial (DN 22). Having reviewed the motions and considered the relevant law, the Court will construe Plaintiff's motions for order to show cause and modification of relief as motions to amend; will grant the first motion to amend and deny the second motion; will grant the United States' motion to dismiss; and will deny all other motions as moot.

**I. SUMMARY OF CLAIMS IN COMPLAINT**

Plaintiff filed a Petition for Writ of Replevin in the Logan Circuit Court, and the United States removed the action to this Court. In his complaint, Plaintiff alleges that he is "seeking compensation and to have Black people to receive compensation for the damage cause by the United States of America by the effects of slavery and segregation." Later in his memorandum in support, he alternatively seeks a writ of elegit and additionally claims that he is suing "Under 28 U.S.C. # 2412(b) and [] Under Writ of Replevin."

Plaintiff claims that "to this date of era [he] was hurt, loss, or damage, because the conditions of slavery, because of the effects of slavery [he] suffers mental and emotional anguish because of slavery in the United States." He contends that his "grandparents father and mother

now descendant from Africa, as well as Eurpeaians descent were held in servitude and reduction to slavery in the United States." He continues that "[t]he servitude and reduction to slavery for as far dated back to 1658 in the United State of America. The plaintiff [] bring this cause of legal consolidated writ of replevin and if denied writ of elegit fore the possibility of paying [plaintiff] and reparations to Black people damaged by the effects of slavery and segregation in the United States of America." He also seeks indemnification damages, liquidated damages, and unliquidated damages "to reimburse to pay back to the plaintiff herewith the hurt, loss, or damage and the forefathers or grand-grand-grand-great-grand parent forefather human right; well as the reimbursement . . . because of slavery involvement and the servitude and reduction to slavery in the [U.S.] approximate the era of 1658. . . . [And] the honorable Court may add the era 1658 the period of time or date before the Antebellum period 1847."

## II. **PLAINTIFF'S FIRST MOTION TO AMEND**

After the action had been removed to federal court, Plaintiff filed a "Motion to Show Cause Why Court Should Grant Writ of Replevin; and if denied Grant Writ of Elegit" (DN 9). The Court construes this motion as a motion to amend. Because the United States referenced this motion in its motion to dismiss, the Court will grant the motion and consider it along with the complaint in ruling on the motion to dismiss.

In the amendment, Plaintiff again seeks reparations and damages for himself and "Black people" damaged by the effects of slavery and segregation. He also recounts his "sad childhood." Plaintiff claims that in April 1970, when he was eleven years old, he was referred to the Comprehensive Care Center by his elementary school principal due to "behavior problems." According to Plaintiff, the examiner at the time noted that Plaintiff's "greatest difficulty appeared on a task involving comprehension of social situation" and opined that Plaintiff's "mother and

father by then separated in 1963, were both exerting negative influences over [Plaintiff] . . . [and that] as the home situation became more extreme, the child's behavior became more negative." Plaintiff further contends that his "social worker characterized both parents as []detrimental to [Plaintiff's] personality formation . . . . [and that] the heavy demands upon Mrs. Long to provide material things for her family 'contributed to the emotional neglect of [Plaintiff].'"[1]  In June 1974, claims Plaintiff, "it was reported that [he] was confused particularly toward white persons upon whom he blamed his commitment."  Plaintiff attaches two 2006 reports and a 2006 affidavit from Phillip W. Johnson, Ph.D., a licensed psychologist, who reports that while Plaintiff carries a diagnosis of paranoid schizophrenia, he is "progressing quite well" in the treatment program.  In his affidavit, Dr. Johnson states:

> Current scientific opinion is that schizophrenia is a genetically transmitted mental illness, which may or may not become activated in the person's life as a result of incurring environmental stressors.  The greater the frequency and intensity of the stressors, given that an individual carries the recessive gene, the greater the likelihood that this gene will be activated during the person's life.  Thus, it is likely that the biological foundation for Mr. Long's illness was present since his birth and may have been activated by the stress experienced when progressing through the Marine Corp boot camp after a lifetime of pre-ceeding stressors.

Plaintiff, thus, opines that his "schizophrenia paranoid came from the Negro people that were damage cause by the United States of America and by the effects of slavery and segregation; [he] inherit [] schizophrenia paranoid <dementia [illegible]] ancesstors or antecessors that was still living during the antebellum period and after [] in 1847."

---

[1]In an attached affidavit, Plaintiff advises:

> My parents; Mr. James Robert Long; Jr. And formal [] Virigian (Long)-Williams did marry in approximately the year 1956.  In 1959. Both parents separated.  Because of Slavery.  And. Plaintiff parents were separated because of the effects of slavery and segregation.  During the next few years, [Plaintiff's] home situation fail to improve because the by the effects of slavery and segregation in the United States of America.

3

Plaintiff asserts private causes of action under 28 U.S.C. §§ 1789, 1932, 1346, and 2412(b), and he requests relief "exceeding over 10,000 in amount for liquidated or unliquidated damages and solidation or and; solidation and it action of violation is an over cause of separate legal action in cause not sounding in tort."

### III. UNITED STATES' MOTION TO DISMISS

The United States moves for dismissal for the following three reasons: (1) lack of standing; (2) sovereign immunity; and (3) a statute-of-limitations bar.

*A. Standard of Review*

While the United States fails to specify under which subsection of Federal Rule of Civil Procedure 12 it brings its motion, the Court construes the motion as being brought under both Rule 12(b)(1) for lack of jurisdiction over the subject matter and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The Court will first consider the challenge to subject matter jurisdiction. *See Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1988) ("A motion under Fed. R. Civ. P. 12(b)(1) questioning subject matter jurisdiction must be considered before other challenges since the court must find jurisdiction before determining the validity of a claim.").

In *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990), the Sixth Circuit Court of Appeals set forth the standard for evaluating motions to dismiss brought under Rule 12(b)(1). The court stated:

> Rule 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties. A *facial* attack on the subject matter jurisdiction alleged by the complaint merely questions the sufficiency of the pleading. In reviewing such a facial attack, a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss. On the other hand, when a court reviews a complaint under a *factual* attack, . . . no presumptive truthfulness applies to the factual allegations.

*Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325 (citations omitted).

"The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). The complaint, or portion thereof, should be dismissed for failure to state a claim upon which relief may be granted, "only if it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000); *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In reviewing a complaint under this standard, the court must accept the factual allegations contained in the complaint as true. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164 (1993). The court must also construe the pleading in the light most favorable to the plaintiff, *Brown*, 207 F.3d at 867, and resolve all doubts in the plaintiff's favor. *Jenkins v. McKeithen*, 395 U.S. 411, 412 (1969). Nevertheless, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). The court is not required to accept non-specific factual allegations and inferences or unwarranted legal conclusions. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996); *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

**B. Analysis**

   *1. Standing*

"It is well established . . . that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). "Article III, of course, gives the federal courts jurisdiction over only 'cases and controversies,' and the doctrine of standing

serves to identify those disputes which are appropriately resolved through the judicial process." *Id.* at 154-55. "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). A plaintiff must establish three elements to satisfy the standing requirement.

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted). "[T]he plaintiff, as the party invoking federal subject matter jurisdiction, has the burden of persuading the court that all of the requirements necessary to establish standing to bring the lawsuit have been met." *Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir. 2002) (citing *Lujan*, 504 U.S. at 561).

In the instant case, Plaintiff's injury is sheer conjecture, he wholly fails to connect his injury to the United States, and it is not likely that the injury would be redressed by a favorable decision. Plaintiff seeks relief based on the alleged *effects* (his parents' problems and resulting divorce and his genetically inherited mental condition) of his ancestors' enslavement and segregation. The direct victims of slavery and segregation, however, are Plaintiff's ancestors,[2] and as noted by the Seventh Circuit,

---

[2] Plaintiff fails to provide evidence that his ancestors were enslaved or involved in any segregation movement by the federal government.

6

> [T]here is a fatal disconnect between the victims and the plaintiffs. When a person is wronged he can seek redress, and if he wins, his descendants may benefit, but the wrong to the ancestor is not a wrong to the descendants. For if it were, then (problems of proof to one side) statutes of limitations would be toothless. A person whose ancestor had been wronged a thousand years ago could sue on the ground that it was a continuing wrong and he is one of the victims.

*In re African-American Slave Descendants Litig.*, 471 F.3d 754, 759 (7th Cir. 2006).

Moreover, it would be an impossible feat (1) to determine that Plaintiff's "sad childhood" (allegedly brought on by his parents' problems) and his schizophrenia are the result of the enslavement and segregation of his ancestors; and (2) to determine that the United States is somehow responsible for his alleged injury. *See In re African-American Slave Descendants Litig.*, 471 F.3d at 759 ("It would be impossible by the methods of litigation to connect the defendants' alleged misconduct with the financial and emotional harm that the plaintiffs claim to have suffered as a result of that conduct."); *Cato v. United States*, 70 F.3d 1103, 1109 (9th Cir. 1995) ("[The plaintiff] neither alleges, nor suggests that she might claim, any conduct on the part of any specific official or as a result of any specific program that has run afoul of a constitutional or statutory right and caused her a discrete injury."). Plaintiff has failed to demonstrate the requisite standing to invoke this Court's jurisdiction over this action. *See, e.g., Cato*, 70 F.3d at 1109-10 (finding that the plaintiff does not "have standing to litigate claims based on the stigmatizing injury to all African Americans caused by racial discrimination" and that "she does not trace the presence of discrimination and its harm to the United States rather than to other persons or institutions").

As Plaintiff does not have standing on his own account, he certainly cannot have standing to represent the interest of "Black people." Moreover, even if he had standing to represent "Black people," "in federal court, a party can represent himself or be represented by an attorney, but cannot be represented by a nonlawyer." *Gonzales v. Wyatt*, 157 F.3d 1016, 1021 (5th Cir. 1998);

7

*Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1308 (2d Cir. 1991); *see also* 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage.").

### 2. *Political-question doctrine*

Additionally, Plaintiff's claim for reparations fails under the political-question doctrine. "Most commonly, . . . the term 'reparations' simply means some sort of financial compensation for descendants of slaves." *In re African-American Slave Descendants Litig.*, 375 F. Supp. 2d 721, 733 (N.D. Ill. 2005). "The political-question doctrine bars the federal courts from adjudicating disputes that the Constitution has been interpreted to entrust to other branches of the federal government." *In re African-American Slave Descendants Litig.*, 471 F.3d at 758. As a sister court found after a thorough review of the history of reparations in the United States,

> [I]t is clear that both during and after the Civil War the issue of reparations to former slaves was one committed to the Representative Branches of the federal government. It was the President and Congress who prosecuted the military and political aspects of the Civil War, ultimately leading to the conclusion of the war. With a goal of preserving the Union and securing an acceptable and lasting peace, it again was the President and Congress who chose to amend the Constitution and enact civil rights legislation in an effort to provide legal equality to the newly freed slaves. Although the Representative Branches decided to take this particular course of conduct in lieu of providing reparations to former slaves, the historical record clearly demonstrates that the Constitution commits this decision to the Representative Branches. By requiring the court to second-guess the decisions of the Representative Branches made more than a century ago, Plaintiffs' Complaint presents a non-justiciable political question.

*In re African-American Slave Descendants Litig.*, 375 F. Supp. 2d at 762 (internal citations omitted).

### 3. *No statutory basis for subject matter jurisdiction*

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206,

212 (1983). Plaintiff references four statutes in his complaint and amendment -- 28 U.S.C. §§ 1789, 1932, 1346, and 2412(b). Section 1789 does not exist. The United States Code contains two statutes identified as 28 U.S.C. § 1932. Neither statute, however, has any applicability to this case, as the first allows the Judicial Conference to prescribe fees and costs to be charged and collected by the Judicial Panel on Multidistrict Litigation and the second allows the court to order revocation of earned good time credit under certain circumstances. This leaves §§ 1346 and 2412(b), both of which provide a limited waiver of the United States' sovereign immunity.

Plaintiff fails to specify under which subsection of § 1346 he brings this action. The only subsections that even remotely apply to his action are (a)(2) and (b). Under § 1346(a)(2), "[t]he so-called little Tucker Act gives district courts and the Court of Federal Claims concurrent jurisdiction of any 'civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.'" *First Virginia Bank v. Randolph*, 110 F.3d 75, 77 (D.C. Cir. 1997) (quoting 28 U.S.C. § 1346(a)(2)); *United States v. Hohri*, 482 U.S. 64, 67 n.1 (1987) ("Jurisdiction in district courts under the Little Tucker Act is limited to nontort claims not exceeding $10,000.").

In his complaint, Plaintiff fails to specify the amount of damages he seeks. In the amendment, however, he specifically alleges that he requests relief "exceeding over 10,000 in amount for liquidated or unliquidated damages and solidation or and; solidation and it action of violation is an over cause of separate legal action in cause not sounding in tort." His claim for damages against the United States, therefore, falls within the exclusive jurisdiction of the Federal Claims Court. *A.E. Finley & Assocs., Inc. v. United States*, 898 F.2d 1165, 1167 (6th Cir. 1990)

("[T]his leaves the Claims Court with exclusive jurisdiction over all Tucker Act claims for more than $10,000, and over Tucker Act claims founded upon a contract with the United States, regardless of the amount of the claim.") (citations omitted).  This Court is, therefore, without jurisdiction to consider Plaintiff's claims under the Little Tucker Act.

To the extent that Plaintiff may be seeking to bring an action under § 1346(b), the Federal Tort Claims Act (FTCA), that Act "gives federal courts jurisdiction only over 'civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945." *Cato*, 70 F.3d at 1107 (quoting 28 U.S.C. § 1346(b)(1)).  Additionally, "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C. § 2401(b).  "By its own terms, therefore, claims arising out of the fact of slavery . . . and other offenses to [Plaintiff's] ancestors that occurred prior to 1945 or were not pursued within two years of their accrual, fall outside the FTCA's limited waiver of sovereign immunity."[3]  *Cato*, 70 F.3d at 1107.  Any FTCA claim must, therefore, be dismissed.

Finally, under 28 U.S.C. § 2412(b), the Equal Access to Justice Act "sets up a limited exception to the general rule of immunity."  *Bergman v. United States*, 844 F.2d 353, 355 (6th Cir. 1988).  Section 2412(b) provides,

> Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States

---

[3]Even giving Plaintiff the benefit of the general statute of limitations, the entire action is time barred.  Under 28 U.S.C. § 2401(a), which provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  Plaintiff wholly fails to demonstrate that any of the historic events about which he complains occurred within the past six years.

10

> shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

Because the Court finds that Plaintiff lacks standing and has further failed to demonstrate this Court's subject matter jurisdiction over his claims, the action must be dismissed against him. As he is not the prevailing party, he is clearly not entitled to attorney's fees and costs. Moreover, as a *pro se* litigant, Plaintiff has not demonstrated any entitlement to attorney's fees. *Kay v. Ehrler*, 499 U.S. 432, 438 (1991) ("A rule that authorizes awards of counsel fees to *pro se* litigants-even if limited to those who are members of the bar-would create a disincentive to employ counsel whenever such a plaintiff considered himself competent to litigate on his own behalf.").

For the reasons set forth more fully above, the Court will grant Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

### IV. **PLAINTIFF'S SECOND MOTION TO AMEND**

Plaintiff filed a request for modification of relief (DN 16), which the Court construes as Plaintiff's second motion to amend. Therein, Plaintiff essentially restates claims alleged in the complaint and its first amendment. He alleges that he brings "this cause for himself and his grandparents and antecessors that was in slavery and segregation. And - for the Black people in America that were with the plaintiff antecessors that were in the Atlanta Slave trade and later the Antelbellum Period." He further claims that "[t]he unprovoked and injurious beating allege in the complaint clearly states an Eight Amendment violation." He also claims that he "and Black People were damaged by the effects of slavery and segregation [they] inherit genetic transmission cells and now pain, suffering, or mental anguish."

11

A district court may deny a motion to amend where, as here, the court finds that the proposed changes are futile, *i.e.*, destined to fail. *See North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1284 (6th Cir. 1997); *LRL Properties v. Portage Metro Housing Auth.*, 55 F.3d 1097, 1104 (6th Cir. 1995).

As found in Section III above, Plaintiff lacks standing to bring this action on his own behalf. His attempt to represent the interests of his grandparents and other ancestors fails because he, as a non-attorney, cannot represent another's interest, and, in any event, any Eighth Amendment claim on his ancestors' behalf would be untimely. Because the amendment is futile, the Court will deny the second motion to amend.

### V. **PLAINTIFF'S MOTIONS FOR CLASS CERTIFICATION AND FOR APPOINTMENT OF COUNSEL FOR THE CLASS**

In granting the United States' motion to dismiss, the Court will deny Plaintiff's motions for class certification (DNs 6 & 19) and for appointment of counsel for the class (DN 6) as moot. *See Miami University Wrestling Club v. Miami University*, 302 F.3d 608, 616 (6th Cir. 2002) ("We have consistently held that a district court is not required to rule on a motion for class certification before ruling on the merits of the case.") (citing *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) and *Jibson v. Mich. Educ. Ass'n-NEA*, 30 F.3d 723, 734 (6th Cir. 1994)).

### VI. **PLAINTIFF'S REQUEST TO PROCEED WITHOUT PAYMENT OF FEES**

Plaintiff has filed a second request to proceed without the payment of fees in this action. As the Court informed Plaintiff by prior Order, no fee is due since the action was removed from state court by the United States. Accordingly, the motion to proceed without the payment of fees (DN 20) will be denied as moot.

## VII.  PLAINTIFF'S MOTION FOR LEAVE OF COURT FOR PARTIES' AGREEMENT OR COURT SETTLEMENT AND MOTION FOR JURY TRIAL

Most recently, Plaintiff has requested leave for parties' agreement or court settlement (DN 21) and a motion for jury trial (DN 22).  Because this action will be dismissed, these motions are moot and will be denied.

The Court will enter an Order consistent with this Memorandum Opinion.

Date:

cc:     Plaintiff, *pro se*
        Counsel of Record
4414.005